UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

| | | |
|---|---|---|
| MARY ANN STOTTS and HEARLENE A. DISHEROON, | ) ) ) | Case No. 4:19-cv-57 |
| *Plaintiffs*, | ) ) | Judge Travis R. McDonough |
| v. | ) ) | Magistrate Judge Susan K. Lee |
| JOHNNY RAY FULTS, | ) ) ) | |
| *Defendant*. | ) | |

**MEMORANDUM OPINION**

Before the Court is Defendant Johnny Ray Fults's motion for summary judgment. (Doc. 25.) For the following reasons, the Court will **GRANT** Fults's motion.

I.    **BACKGROUND**

In 2011, Plaintiff Mary Ann Stotts began dating Hubert Dewayne Hargis, who, at that time, was the Road Superintendent for the Grundy County Highway Department (the "Highway Department"). (Doc. 25-3, at 3.) Beginning in September 2014, Stotts became the office manager for the Highway Department.[1] (Doc. 25-2, at 2.) In her role as office manager, Stotts was responsible for:

- handling employee insurance issues, including new insurance enrollment and annual re-enrollment (*id*.; Doc. 25-3, at 7–9);

- completing daily, weekly, and monthly reports, as needed (Doc. 25-2, at 2);

- processing payroll and vendor checks (*id*.; Doc. 25-3, at 16–21);

---

[1] According to Stotts, certain budgeting documents referred to her position as "bookkeeper." (Doc. 25-3, at 8.)

- preparing vendor purchase orders (Doc. 25-3, at 23.)

- tracking employee time, including tracking vacation and sick time, and related data entry (Doc. 25-2, at 2; Doc. 25-3, at 17–18);

- handling employee retirement benefits, including writing checks and depositing funds into employee retirement accounts, and keeping employee personnel files up to date (Doc. 25-2, at 2; Doc. 25-3, at 10–11, 22);

- handling customer-service issues, including phone calls and face-to-face meetings, as well as taking reports of problems with roads (Doc. 25-2, at 2; Doc. 25-3, at 24–25);

- typing policies, handbooks, internal controls, and other documentation as needed by the superintendent (Doc. 25-2, at 2; Doc. 25-3, at 25–27);

- performing bookkeeping duties, including reconciling accounts and balance sheets, tracking expenses, and preparing budgeting documents based on instructions from the superintendent (Doc. 25-2, at 2–3; Doc. 25-3, at 28–30);

- attending county commission meetings with Superintendent Hargis to provide him information as needed (Doc. 25-3, at 28.)

According to Stotts, she performed all of these duties at the direction of Superintendent Hargis. (Doc. 25-2, at 3.) Stotts, however, testified that she considered herself the face and voice of the Highway Department for day-to-day operations. (Doc. 25-3, at 25–26.) Specifically, when asked "as the office manager, is it fair to say that you're the face and voice to the public of the highway department?" Stotts responded, "[t]o some extent, yes. I mean I'm going to be the first one that would be here when they call in or most of the time when they would come in." (*Id*.)

In April 2018, Stotts fell and hurt herself. (Doc. 25-2, at 3.) As a result of Stotts's injury, Superintendent Hargis hired Plaintiff Hearlene Disheroon, Stotts's mother, to temporarily perform Stotts's work. (*Id*.) Hargis eventually hired Disheroon to a full-time secretary position. (*Id*. at 6.) According to Stotts, Disheroon did everything she did except processing payroll and vendor checks but was learning how to do those tasks. (Doc. 25-3, at 32–33.)

In 2018, after serving as superintendent for sixteen years, Hargis lost the superintendent election, and Defendant Johnny Ray Fults was elected to replace him. (*See* Doc. 25-3, at 4–5;

2

Doc. 25-5, at 1.) Fults took office on September 4, 2018, and, on that date, terminated Stotts and Disheroon. (Doc. 25-5, at 1.) According to Fults:

> I just—I went in and told [Stotts] that I was just—I appreciated their service, but I was going in a different direction and I was starting, you know, starting fresh and I just, you know, was going in a different direction. It wasn't anything personal and that I was, you know, going to get my own office staff of someone that I knew well.

(Doc. 29-2, at 24.) Stotts's separation notice also provided that "[t]he decision has been made to hire someone else for the ADMINISTRATIVE/MANAGERIAL position who the County Road Superintendent feels is better suited for the position." (Doc. 25-6, at 1.) Fults avers that, when he took office, he needed an office manager who could learn the systems and procedures necessary to run the Highway Department office and whom he could trust not to undermine his job performance and service to Grundy County residents. (*Id*. at 2–3.) Fults did not have that trust in Stotts and Disheroon. (*Id*. at 3.) Fults further avers that, before taking office, he knew that Stotts had a personal relationship with Hargis, that they had lived together for several years, and that Disheroon was Stotts's mother. (*Id*. at 2.) Fults further testified that he knew that Stotts and Disheroon were active supporters of Hargis. (*See Id*. at 22.) Fults admits that he made the decision to terminate Stotts before taking office and that he did not interview her. (*Id*. at 20).

At the time of their termination, Stotts and Disheroon were the only employees who worked in the Highway Department office. (Doc. 25-5, at 1.) Fults avers that he felt it was unnecessary to have two full-time employees in the Highway Department office and that the county could save money by only having one full-time office employee. (*Id*.) Fults also knew

that Hargis was being investigated by the Tennessee Comptroller's office for misusing county resources.[2] (*Id*.)

According to Stotts, when Fults was elected, he did not know what her day-to-day job duties were as office manager. (Doc. 25-3, at 37.) Fults, however, avers that, when he took office, he knew that office personnel: (1) handled payroll and insurance matters, including keeping up with employee work hours, vacation time, and sick time; (2) prepared employee paychecks; (3) worked closely with the superintendent to prepare reports and budgets and make purchases from third parties; (4) answered phones and took information that needed to be communicated to the superintendent, including complaints and work requests; and (5) communicated with state employees and officials regarding office procedures. (Doc. 25-5, at 2.) Fults concedes that he did not know how Stotts and Disheroon divided those duties, and further admits that he had, and still has, limited knowledge of the computer system and software used by the Highway Department for payroll, insurance, and vendor payments. (*Id*.) When asked to describe what Stotts's replacement does as office manager, Fults testified: "She does all the office duties. She writes checks. She takes care of insurance. She does all the office duties of the highway department." (Doc. 29-2, at 22.)

Stotts and Disheroon initiated the present action on August 28, 2019. (*See* Doc. 1.) In their complaint, Stotts and Disheroon assert claims for wrongful discharge pursuant to 42 U.S.C. § 1983 based on alleged violations of their First Amendment rights to free expression, free association, and free speech. (*Id*. at 4.) Initially, Stotts and Disheroon named the following as

---

[2] In March 2019, a Grundy County grand jury indicted Hargis on eight counts of official misconduct based on conduct that occurred between March 5, 2017, and September 1, 2018, while Hargis was superintendent. (Doc. 25-8.)

defendants: (1) Fults, in his official and individual capacities; (2) Grundy County, Tennessee; and (3) the Grundy County Highway Department. (*See id*.) On October 4, 2019, however, the parties stipulated to dismissal of Stotts's and Disheroon's claims against Grundy County and the Grundy County Highway Department. (Doc. 14.) The parties also stipulated to dismissal of Stotts's and Disheroon's official-capacity claims against Fults. (*See id*.) As a result, only Stotts's and Disheroon's individual-capacity claims against Fults remain. Fults has moved for summary judgment on Stotts's and Disheroon's claims against him (Doc. 25), and the motion is now ripe for the Court's review.

## II. STANDARD OF LAW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The moving party may meet this burden either by affirmatively producing evidence establishing that there is no genuine issue of material fact or by pointing out the absence of support in the record for the nonmoving party's case. *Celotex*, 477 U.S. at 325. Once the movant has discharged this burden, the nonmoving party can no longer rest upon the allegations in the pleadings; rather, it must point to specific facts supported by evidence in the record demonstrating that there is a genuine issue for trial. *Chao v. Hall Holding Co., Inc.*, 285

F.3d 415, 424 (6th Cir. 2002).

At summary judgment, the Court may not weigh the evidence; its role is limited to determining whether the record contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A mere scintilla of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the non-movant based on the record. *Id.* at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If not, the Court must grant summary judgment. *Celotex*, 477 U.S. at 323.

## III.   ANALYSIS

Stotts and Disheroon contend that Fults violated their First Amendment rights by terminating their employment after they supported Hargis in his campaign to be reelected as superintendent and assert their claims pursuant to 42 U.S.C. § 1983. (*See* Doc. 1, at 3–4.) To establish a violation under § 1983, Stotts and Disheroon must demonstrate that Fults deprived them of their constitutional rights while acting under the color of state law. *Summe v. Kenton Cnty. Clerk's Off.*, 604 F.3d 257, 264 (6th Cir. 2010).

Dismissals for failure to support a particular candidate or party ("patronage dismissals") generally violate the First Amendment. *Id.* (citing *Elrod v. Burns*, 427 U.S. 347 (1976)). Although patronage dismissals are generally unconstitutional, "party affiliation" or supporting a particular candidate for public office "may be an acceptable requirement for some types of government employment." *Id.* (quoting *Branti v. Finkel*, 445 U.S. 507, 517 (1980)). "[I]f an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency." *Branti*, 445 U.S. at 517.

"To determine whether political affiliation is appropriate in making a personnel decision, [courts] must examine the inherent duties of that position and the duties that the new holder of that position will perform." *Summe*, 604 F.3d at 265 (quoting *Baker v. Hadley*, 167 F.3d 1014, 1018 (6th Cir. 1999)). "[M]aking this determination does not depend on the plaintiff's actual job duties," but "those duties may nonetheless serve as evidence of the duties inherent in the position." *Id.* Courts "must look beyond the mere job title and examine the actual duties of the specific position; . . . [i]t is the inherent duties of the position in question, not the work actually performed by the person who happens to occupy the office that must be analyzed." *Sowards v. Louden Cty., Tenn.*, 203 F.3d 426, 435 (6th Cir. 2000) (cleaned up).

The United States Court of Appeals for the Sixth Circuit has identified four categories of government positions "that will always qualify" as exceptions to the rule against patronage dismissals: (1) positions "that are specifically named in a relevant statute or that are charged with discretionary authority to carry out the law or other policy of political concern" ("Category-One Positions"); (2) "a position to which discretionary decisionmaking of the first category has been delegated" ("Category-Two Positions") ; (3) "confidential advisors who spend a significant amount of their time advising category-one employees on how to exercise their statutory policymaking authority, or other employees who control the lines of communication to category-one employees" ("Category-Three Positions"); and (4) "positions filled to balance out party representations" ("Category-Four Positions"). *Summe*, 604 F.3d at 265 (citing *McCloud v. Testa*, 1536, 1557 (6th Cir. 1996)). "If a particular position falls into one of these categories, then political affiliation is an appropriate consideration for that position and a public employee may be dismissed without violating the First Amendment." *Sowards*, 203 F.3d at 436. However, "a government position need not fall neatly within one the categories" to remove an employee

"from the constitutional protection against political dismissal enjoyed by other employees." *Ray v. Davis*, 528 F. App'x 453, 459 (6th Cir. 2013).

In patronage-dismissal cases, the plaintiff must first "make out a *prima facie* case that she was discharged . . . because of political affiliation." *Summe*, 604 F.3d at 257 (citing *Branti*, 445 U.S. at 518)). "If the plaintiff succeeds in making that showing, the defendant must then show that the position is of a type that would qualify for an exception to the rule against patronage dismissals." *Id*. "Whether political affiliation is an appropriate consideration for employment or termination is a question of law," and "[t]he issue on summary judgment is whether Defendants have established that no genuine issues of material fact exist as to whether political affiliation may appropriately be considered with respect to the position in question." *Sowards*, 203 F.3d at 435.

In this case, Fults is entitled to summary judgment because the evidence demonstrates no genuine issues of material fact exist as to whether political affiliation may appropriately be considered with respect to Stott's and Disheroon's positions as office manager and secretary.[3] Fults's position as superintendent qualifies as a Category-One position because superintendent is defined by Tennessee statute as the chief administrative office of the Highway Department, Tenn. Code Ann. § 54-7-103, and the superintendent is given general control over "the repair and maintenance of the county road systems, Tenn. Code Ann. § 54-7-109(a). Because superintendent is a Category-One position, Stotts's and Disheroon's positions as office manager and secretary constitute Category-Three positions if they "functioned as either a confidential advisor" to the superintendent or as "a confidential employee who controlled the lines of

---

[3] Fults does not argue that Stotts and Disheroon failed to satisfy their burden at the *prima facie* stage to supply evidence that they were discharged because of political affiliation. (*See* Doc. 26.)

communication" to the superintendent. *Ray*, 528 F. App'x at 459. In her deposition, Stotts testified that she considered herself the face and voice of the Highway Department for day-to-day operations. (Doc. 25-3, at 25–26.) Specifically, when asked "as the office manager, is it fair to say that you're the face and voice to the public of the highway department," Stotts responded, "[t]o some extent, yes. I mean I'm going to be the first one that would be here when they call in or most of the time when they would come in." (*Id*.) In her deposition testimony and interrogatory responses, Stotts further admitted that she: (1) prepared vendor purchase orders (Doc. 25-3, at 23.); (2) handled customer-service issues, including phone calls and face-to-face meetings, as well as taking reports of problems with roads (Doc. 25-2, at 2; Doc. 25-3, at 24–25); (3) reconciled accounts and balance sheets, tracked expenses, and prepared the budget documents based on instructions from the superintendent (Doc. 25-2, at 2–3; Doc. 25-3, at 28–30); and (4) attended county commission meetings with the superintendent to provide him information as needed (Doc. 25-3, at 28). Stotts and Disheroon further concede that Disheroon performed the same duties as Stotts with the exception of processing payroll and vendor checks (Doc. 25-3, at 32–33.) As a result, even if Stotts and Disheroon performed primarily administrative duties for Hargis, the undisputed evidence demonstrates that the inherent duties of Stotts's and Disheroon's positions included controlling the lines of communication to the superintendent such that they fall within an exception to the rule against patronage dismissals. *See Ray*, 528 F. App'x at 460. Accordingly, the Court will **GRANT** Fults's motion for summary judgment.

IV. **CONCLUSION**

For the reasons stated herein, Fults's motion for summary judgment (Doc. 25) is **GRANTED**. Stotts's and Disheroon's claims against Fults for violation of their First

Amendment rights brought pursuant to 42 U.S.C. § 1983 will be **DISMISSED WITH PREJUDICE**.

**AN APPROPRIATE JUDGMENT WILL ENTER.**

> /s/ *Travis R. McDonough*
> **TRAVIS R. MCDONOUGH**
> **UNITED STATES DISTRICT JUDGE**